Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. On 6 April 1994, an employment relationship existed between plaintiff and defendant-employer.
3. On 6 April 1994, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer, which defendants have accepted as compensable only as it pertains to plaintiff's physical, as opposed to mental or psychiatric, injuries. This injury by accident was the subject of a Form 21, approved by the Commission on 20 June 1994.
4. The issues heard before the Deputy Commissioner were:
 (a) Whether the plaintiff's post-traumatic stress disorder (hereinafter "PTSD") is causally related to her on the job injury at defendant-employer's place of business?
 (b) Whether defendants are responsible for the payment of medical bills related to the treatment of plaintiff's PTSD?
 (c) Whether the plaintiff is entitled to temporary total benefits for the period of 18 January 1995 through the present?
 (d) Whether plaintiff's husband, Donald Price, is entitled to reimbursement for attendant care of plaintiff following her 6 April 1994 injury? (Dates include April 7, 8, 29, 1994; May 6, 9-13, 16-20, 31, 1994; June 1-3, 20-24, 1994; July 6, 15, 20-22, 26-27, 1994; August 9-11, 19, 1994).
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a female who was born on 11 September 1950. She is a high school graduate and has taken classes at Western Piedmont College.
2. Plaintiff began working for wages at age 15. Plaintiff has previously worked as a sewing machine operator in a hosiery mill for 12 years. She also ran a tax preparation business out of her home.
3. Plaintiff began working for defendant-employer, a ceramic tile manufacturer, in August 1993. From October 1993 until her accident in April 1994, plaintiff worked in the glaze line operation. This area contained the glaze spray machine and a loader bed machine, which was used to load finished tiles into carts.
4. On 6 April 1994, plaintiff was working on the glaze line when she noticed a bad tile. Plaintiff climbed to the top of the loader bed to try to retrieve the bad tile. As she reached across the bed, something struck her from behind, knocking her onto a metal bar that crossed the loader bed. The loader bed then rose upward, pinning plaintiff between the bed's cross beams and a support beam above, causing crushing injuries to plaintiff's abdomen and right side of her body. A warning bell rang and plaintiff's co-workers rushed to the scene of the accident in an attempt to help plaintiff. Plaintiff could hear her bones crushing, then passed out.
5. Burke County E.M.S. arrived at the scene to find plaintiff curled on the floor with her face a bluish color from the neck up. E.M.S. transported plaintiff to Grace Hospital in Morganton. Plaintiff was initially treated at the Grace Hospital emergency room. However, because of the seriousness and extent of her injury, the attending physician transferred her to Memorial Mission Hospital in Asheville.
6. Plaintiff sustained serious bodily injuries as a result of her accident. Her injuries included severe facial and ocular edema, a right open pelvic fracture, a right femur fracture, multiple rib fractures, pulmonary contusion, injury to her right sciatic nerve, a vaginal hematoma, and a torn urethra. Plaintiff underwent emergency surgery to repair the fractures at Memorial Mission Hospital.
7. Plaintiff was kept in Memorial Mission Hospital until 19 April 1994. She was then transferred to Thoms Rehabilitation Hospital for an intensive inpatient rehabilitation program.
8. Plaintiff was released from Thoms and returned to her home on 6 May 1994. At that time, she was still confined to her bed or a wheelchair and needed assistance in her daily living.
9. In April, 1994, defendant-carrier hired Southern Rehabilitation Network to manage plaintiff's medical care and rehabilitation. Rebecca Helton, a registered nurse and certified rehabilitation counselor, was assigned as plaintiff's case manager. It was arranged that, upon her return home, plaintiff would have visits from a home health nurse and a home health physical therapist. Arrangements were also made for a home sitter to stay with plaintiff while her husband was at work beginning 23 May 1994.
10. On 3 June 1994, plaintiff was examined by Dr. Jon M. Silver complaining of symptoms of a severe head injury.
11. During her convalescence at home plaintiff required assistance, which she received from her husband and the attendants provided by defendant-carrier. Plaintiff's husband provided attendant care services greater than those customarily provided in the marital relationship. From 6 May 1994 through 22 May 1994, the services rendered plaintiff by her husband were reasonable and necessary. A home sitter began staying with plaintiff on 23 May 1994.
12. Plaintiff "fired" the home sitter on or about 10 June 1994, apparently due to conflicts with her. Plaintiff dismissed her sitter and did not request that defendant-carrier provide a replacement. Plaintiff told Ms. Helton that she could get along by herself and with the assistance of family members.
13. Plaintiff progressed well in her physical recovery. By 15 August 1994, plaintiff had completed a physical therapy program at Burke Rehabilitation and could walk using a straight cane.
14. Dr. De Paolo of Blue Ridge Bone and Joint Clinic was plaintiff's treating orthopaedic surgeon. On 29 August 1994, Dr. De Paolo was of the opinion that plaintiff could return to light duty work, beginning with two hours daily and progressively increasing by one hour daily each week.
15. On or about 12 September 1994, plaintiff returned to a modified job with defendant-employer, working two hours per day inspecting trim tile. Although she was able to perform her duties, plaintiff complained of right hip pain. Additionally, the sight and sounds of the machinery in defendant-employer's plant caused plaintiff anxiety by constantly reminding her of her accident. The plant is small. Even when plaintiff worked in different locations, she was not totally isolated from the sight and sound of the machinery that caused her injury.
16. Because of her complaints of pain and anxiety, Dr. De Paolo took plaintiff out of work as of 19 September 1994. Plaintiff was also referred for evaluation to Dr. Scott Cutting, Ph.D., a psychologist.
17. On 30 September 1994, Dr. Cutting first saw plaintiff. Dr. Cutting conducted a clinical interview and administered a Minnesota Multiphasic Personality Inventory (MMPI) test. Plaintiff's symptoms and the type of injury she sustained met the criteria of the Diagnostic and Statistical Manual (DSM-III-R) for PTSD.
18. Dr. Cutting was of the opinion that plaintiff developed PTSD as a result of her traumatic accident of 6 April 1994. PTSD may develop after a severe and life-threatening trauma. PTSD sufferers have vivid recollections of their trauma, which may be triggered by factors associated with the original traumatic event, such as sights, sounds, or smells. PTSD is also characterized by symptoms of anxiety and depression.
19. Plaintiff's treatment for PTSD included desensitization. This is a process of exercises designed to reduce, and potentially eliminate, plaintiff's anxiety upon exposure to the scene of her accident. Plaintiff's home is across the street from the plant where she was injured. The desensitization treatment was partially successful in that she is able to deal with seeing the outside of the plant from afar. However, plaintiff still has anxiety when inside the plant, and she has been unable to desensitize herself to the area where her accident occurred. Therefore, she is unable to work in that environment.
20. On 10 November 1994, plaintiff underwent surgery to remove the hardware from her right leg. Plaintiff healed well, but she had increased pain following the surgery.
21. In early December 1994, plaintiff began a work-hardening program at Burke Rehabilitation. On 5 January 1995, Dr. De Paolo noted that plaintiff was healing well. Dr. De Paolo was of the opinion that if she had sitting capabilities she could probably return to half a day of light duty work. He recommended work hardening with a 20-pound limit.
22. Plaintiff returned to work for defendant-employer for two hours daily on 26, 27, and 30 January 1995, and on 2 February 1995. Plaintiff's symptoms of anxiety and depression increased during this attempted return to work. Plaintiff had difficulty sleeping because of nightmares and flashbacks of her traumatic accident.
23. Plaintiff was being monitored during this time by her family physician, Dr. James M. Croft. In January 1995, Dr. Croft referred plaintiff to a psychiatrist, Dr. Khaja Ahsanuddin. Dr. Ahsanuddin first saw plaintiff on 2 February 1995. Dr. Ahsanuddin diagnosed severe PTSD, with symptoms of depression. Dr. Ahsanuddin is of the opinion that plaintiff's PTSD causally relates to her 6 April 1994 accident.
24. Due to her psychological condition and her expressions of suicidal thoughts, plaintiff was hospitalized at Grace Hospital from 9 February 1995 to 1 March 1995. She was very depressed upon admission and, according to Dr. Ahsanuddin, was not able to work at that time.
25. Plaintiff improved during her hospitalization at Grace. Upon her release, plaintiff decided that she could not return to work for defendant-employer. Although he did not place this restriction on her, Dr. Ahsanuddin did not think plaintiff could effectively return to work at the site of her traumatic accident.
26. Before her injury by accident, plaintiff had serious family problems with her husband and daughter. Plaintiff and her husband were seriously contemplating a divorce. At some point, plaintiff learned that her husband had been unfaithful to her, and there were indications that he may have been abusive. Plaintiff and her husband did finally divorce in December 1995, although they continued to live in the same trailer. However, plaintiff was able to deal with her family problems before her injury by accident and never needed psychological intervention.
27. Plaintiff's injury by accident caused a loss of sensation which interfered with her sexual relationship with her husband. Plaintiff's dependence on her husband for financial, physical, and emotional support after her injury by accident also caused increased stress in the marital relationship.
28. Plaintiff's traumatic accident and resulting injuries caused plaintiff's PTSD and depression, either directly or as an aggravation of any pre-existing mental and emotional problems. As a result, plaintiff became depressed, contemplated suicide, and required hospitalization at Grace Hospital in February 1995.
29. As a result of her PTSD, plaintiff continues to be unable to return to work for defendant-employer. Although she may be physically capable of performing light duty tasks, plaintiff is psychologically unable to cope with defendant-employer's work environment, the site of her traumatic injury.
30. In addition to her PTSD and depression, Dr. Cutting noted that plaintiff exhibited thought disorders, such as concocting grandiose plans without regard to reality. While the evidence is unclear as to whether plaintiff sustained an injury to her head on 6 April 1994, it is possible that these thought disorders resulted from a closed-head injury. A neuropsychological evaluation by a physician with expertise in closed-head injuries is needed to make a definite assessment.
31. Plaintiff has attempted to find work with other employers. However, these efforts have not been successful. Plaintiff began working for an insurance company and was sent for training but, for reasons not entirely clear, was not able to continue in this position. Plaintiff attempted to baby-sit for her grandchildren but could not continue due to headaches and stress. She has made other applications for work, but she has received no positive response.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. As a result of her compensable injury by accident of 6 April 1994, plaintiff developed PTSD and depression, for which plaintiff received psychiatric treatment. Defendants are responsible for all such reasonable and necessary psychiatric treatment rendered or to be rendered to plaintiff as tends to effect a cure, give relief, or lessen any period of disability, including the treatment by Dr. Cutting, Dr. Ahsanuddin, and treatment rendered at Grace Hospital in February and March 1995. N.C. Gen. Stat. §§ 97-2(19), 97-25.
2. As a result of her compensable injury, plaintiff required attendant care upon her return home from the hospital on 6 May 1994. Plaintiff's husband is entitled to payment by defendants for care rendered to plaintiff during her recovery for the period of 6 May 1994 through 22 May 1994. This payment shall be computed at the same rate per day as that paid to the professional sitter provided to plaintiff by defendants. Plaintiff's husband is not entitled to payment for attendant care following 22 May 1994, because plaintiff fired the sitter provided her and informed defendant-carrier that she could manage without one. N.C. Gen. Stat. § 97-25.
3. Since the entry and approval of the Form 21 in this case, defendants have not offered plaintiff suitable employment. Due to her PTSD, sustained as a result of her compensable injury by accident, plaintiff is not able to return to any employment in defendant's plant, the site of her traumatic accident. Therefore, plaintiff's refusal to return to work for defendant after 2 February 1995 was justified. N.C. Gen. Stat. § 97-32.
4. Plaintiff continues to be incapable of earning the same wages she earned prior to her injury by accident in the same or any other employment due to injuries sustained in her compensable accident and is entitled to resumption of total disability compensation benefits. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to receive and defendants shall be responsible for further psychiatric evaluation as may be needed to determine whether plaintiff sustained a closed-head injury as a result of her compensable injury by accident. N.C. Gen. Stat. §§ 97-2(19), 97-25.
6. Defendants are responsible for any further vocational rehabilitation and/or training as may reasonably be necessary to assist plaintiff in returning to gainful employment. Plaintiff is responsible for cooperating with any such program. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for medical treatment, including psychiatric treatment, as was or may in the future be reasonably necessary due to plaintiff's injury by accident and resulting PTSD and depression.
2. Defendants shall pay for attendant care provided by plaintiff's husband, Donald Price, from 6 May 1994 through 22 May 1994, at the same daily rate as that paid to the professional sitter provided by defendants.
3. Defendants shall continue to pay plaintiff compensation at the rate of $196.68 per week, resuming from the last date of compensation paid and continuing until further order of the Commission.
4. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff is approved for her counsel. Twenty-five percent of any lump sum due plaintiff shall be deducted and paid directly to her counsel. Thereafter, every fourth check due plaintiff shall be paid directly to her counsel.
5. Defendants shall pay for all further psychiatric evaluation required to determine whether plaintiff sustained a closed-head injury as a result of her compensable injury by accident.
6. Defendants shall continue to pay for any vocational services as may reasonably be necessary to assist plaintiff in returning to gainful employment, and plaintiff shall comply with any such program.
7. Defendants shall pay the costs.
 *********** S/ ____________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ________________ THOMAS J. BOLCH COMMISSIONER
S/ ________________ CHRISTOPHER SCOTT COMMISSIONER
RCR:mdg